IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN THE MATTER OF:<br><br>KAREN J. ANTHONY,<br><br>         Debtor. | 4:12-CV-3124<br>4:12-CV-3125<br>4:12-CV-3126<br><br>BANKRUPTCY NO. BK11-42232<br><br>MEMORANDUM AND ORDER |

These three cases are appeals from orders of the United States Bankruptcy Court. In case no. 4:12-cv-3124, the appellant, Karen J. Anthony, appeals from the bankruptcy court's order granting Cattle National Bank & Trust Company's motion for relief from the automatic bankruptcy stay. In case no. 4:12-cv-3125, Anthony appeals from the bankruptcy court's overruling of her objection to Cattle National's proof of claim. And in case no. 4:12-cv-3126, Anthony appeals from an order that sustained in part and in part overruled her objection to the claim of the Edenton North Homeowner's Association.

Anthony claims the bankruptcy court erred in a number of ways. The Court has seen many of her arguments before. They are regularly peddled on the less reliable corners of the Internet by tax protesters, "sovereign citizens," and other conspiracy theorists. Anthony has joined the ranks of the unwary, unwise, and often desperate victims to be persuaded that taxes are voluntary, money isn't "money," and you don't really have to pay your bills. The truth: they aren't, it is, and you do. The Court, having reviewed the bankruptcy court record and the parties' briefing in these appeals, affirms the bankruptcy court's orders.

## I. BACKGROUND

The plot of land that is at the heart of these disputes is a residential lot in Lincoln, Nebraska that Anthony purchased in 2001. Filing 59.[1] Anthony had been living in a house on an adjoining lot, and bought the residential property that is at issue when it was still an unimproved lot. At the time Anthony's deed was recorded, the lot was subject to a previously recorded

---

[1] To simplify discussion of the record in these three appeals, the "filing" and "claim" numbers cited refer, unless otherwise specified, to the bankruptcy court's docket or claims register in bankruptcy case no. 11-42232.

declaration of restrictive covenants, which had been recorded by the Lincoln Land and Mortgage Company in late 2000. Filing 60. Among other things, the declaration provided that any person who became record owner of a lot in the subdivision would become a member of the yet-to-be-created Edenton North Homeowner's Association, and that each member of Edenton North

> shall be deemed to covenant to maintain the Commons, which covenants by the members shall be satisfied by the payment of actual and special assessments for the administration, maintenance or improvement of the Commons. Such annual and special assessments shall be uniform as to each lot or living unit within [Edenton North]. Each such assessments [sic] shall be the personal obligation of the member who is, or was, the record owner of the lot or living unit assessed at the time of such assessments . . . and, when shown of record, shall be a lien upon the lot or living unit assessed.

Filing 60 at 3.

In 2005, Anthony borrowed money from Cattle National to build a residence on the lot.[2] Filing 54-1. Anthony executed a promissory note for $285,000. Filing 54-1 at 1. That amount was later increased to $310,000 so that the basement of the constructed residence could be finished. Filing 54-1 at 3. Brian Lavelle, a vice-president at Cattle National, testified that the loan was a business purpose loan: Lavelle said that Anthony's intent was to build a residence, or "spec house," on the then-vacant lot, then sell it for a profit. Case no. 4:12-cv-3124 filing 9 at 8, 24-25. Lavelle said that although Anthony was not in the business of home construction and had no experience building, Cattle National felt comfortable with the loan because Anthony planned to work with an established builder. Case no. 4:12-cv-3124 filing 9 at 27-28.

Cattle National supplied funds to Anthony to finance construction of the house. Filing 54-3 at 2. Lavelle testified that the funds were transferred from the bank to the title company via cashier's check, then the title company paid the contractors' bills. Case no. 4:12-cv-3124 filing 9 at 12. When the note matured in 2006, Anthony started making payments. Filing 54-3 at 2. But according to Lavelle, when the house was completed and placed on the market in 2006, it did not sell. Case no. 4:12-cv-3124 filing 9 at 26. At some

---

[2] The Court recognizes that Anthony disputes many of these facts, or at least disputes whether there is evidence in the record sufficient to prove them. As will be explained in detail below, the Court finds Anthony's arguments in this regard to be without merit, and this statement of facts is predicated upon those findings.

2

point, Anthony moved into the house herself. Case no. 4:12-cv-3124 filing 9 at 26.

   Some of Anthony's payments were deferred, but in 2008, Anthony was making payments on a monthly basis. Filing 54-3 at 1-2. The due date for the final balloon payment on the note kept getting pushed back, until the remaining balance of payments, in the amount of $248,632.56, was due on March 31, 2011. Filing 54-1 at 9. But Anthony's monthly payments became inconsistent after October 2010, and after a final $2,000 payment in February 2011, Anthony stopped paying. Filing 54-1 at 1. Nor did Anthony pay the property taxes for tax years 2010 or 2011. Filing 54-4. And Anthony does not dispute that she failed to pay the homeowners' association dues that Edenton North began assessing in 2008. Claim 3-1 at 8.

   The note had been secured by a deed of trust executed on the same day as the note. Filing 54-2. After Anthony stopped making payments, Cattle National sought to sell the property pursuant to the deed of trust and the Nebraska Trust Deeds Act, Neb. Rev. Stat. § 76-1001 *et seq*. In response, Anthony filed a "Complaint to Quiet Title" in United States District Court. Case no. 4:11-cv-3064 filing 1. In that action, Anthony raised a legal theory that is worth setting forth at length, because the same theory underlies her arguments in these appeals. Anthony alleged that she delivered the promissory note to Cattle National, but that

> [u]nder the guise of fraud, the Bank knowingly failed to disclose to Anthony that being its [sic] a National Bank it could not lawfully loan Anthony its own assets, or its own credit, or its depositors funds; that the Bank needed Anthony's signed Promissory Note; that the Bank deposited or recorded Anthony's Promissory Note as an asset then recorded an offsetting liability that matches the asset that the Bank accepted from Anthony of $285,000.00; that the Bank used Anthony's Promissory Note to raise an asset in its bookkeeping entries to itself and used the face value of the Promissory Note called principal which the Bank loaned Anthony and against which the Bank charged Anthony interest; that the Bank did not risk any of its assets; that consideration on the part of the Bank was nonexistent; and, that it was Anthony who created the money for the alleged Loan when the Bank accepted Anthony's Promissory Note.

Case no. 4:11-cv-3064 filing 10 at 3. But United States District Judge Laurie Smith Camp found that the federal courts lacked jurisdiction over Anthony's claim, and dismissed the case. *Anthony v. Cattle Nat'l. Bank & Trust Co., No.*

3

4:11-cv-3064, 2011 WL 3665403 (D. Neb. Aug. 22, 2011), *aff'd*, 684 F.3d 738 (8th Cir. 2012). In particular, the Court concluded that the federal banking laws Anthony claimed had been violated did not create a private right of action, and therefore did not support federal question jurisdiction. *Id.* at 4-5.

The day after her "quiet title" claim was dismissed, Anthony filed a bankruptcy petition. Filing 1. A few weeks later, Anthony filed an adversary complaint against Cattle National in the bankruptcy court, essentially re-alleging the same theory from the previous "quiet title" claim. Filing 20. Cattle National moved the bankruptcy court to abstain or stay the adversary proceeding pending the Eighth Circuit's consideration of Anthony's appeal from the district court's dismissal of the "quiet title" claim. Adversary proceeding no. 11-4216 filing 4. The bankruptcy court agreed and stayed the adversary proceeding. Adversary proceeding no. 11-4216 filing 20 (text order).

Edenton North filed a claim in the bankruptcy case, as did Cattle National. Claims 3-1 and 6-1. Anthony objected to both claims. Filings 69, 77, and 173. Cattle National filed a motion for relief from the automatic bankruptcy stay. Filing 105. Hearings were held on Anthony's objections and Cattle National's motion. The bankruptcy court granted Cattle National's motion for relief from the stay, reasoning that Anthony's arguments about national banking law did not permit her to resist Cattle National's demand for payment, and finding that Anthony's bankruptcy petition had been filed in bad faith. Filing 201. The bankruptcy court overruled Anthony's objection to Cattle National's claim for similar reasons. Filing 205. And the bankruptcy court sustained in part, but overruled in part, Anthony's objection to Edenton North's claim: the court found that only $288.28 of the $1,295.38 claim was secured by the real estate, but that the balance of the claim would be permitted as an unsecured claim. Filing 203 at 2. Anthony appeals from each of those orders.

## II. STATEMENT OF ISSUES

In both case nos. 4:12-cv-3124 and 4:12-cv-3125 (the appeals from the orders relating to Cattle National), Anthony raises the same issues, as slightly restated:

1. Whether the bankruptcy court erred in refusing to allow Anthony discovery with respect to Cattle National.

2. Whether the bankruptcy court erred in ignoring Anthony's motion for a formal hearing to consider her objection to Cattle National's proof of claim and failing to schedule any hearing to consider her objection prior to granting Cattle National's motion for relief from the automatic stay.

3.    Whether the bankruptcy court erred in finding that Anthony was a "speculative builder" and consequently finding that federal disclosure laws did not apply to the alleged loan from Cattle National.

4.    Whether the bankruptcy court erred in overlooking many verified and admitted "discrepancies" in loan documents.

5.    Whether the bankruptcy court erred in granting Cattle National's motion for relief from the automatic stay while having granted Cattle National's motion for stay of the adversary proceeding.

6.    Whether the bankruptcy court erred in asserting that the validity of the acts of a national bank or its officers can only be questioned by the federal government in direct proceedings, and not by private parties.

7.    Whether the bankruptcy court erred in relying on a treatise, Michie on Banks and Banking, as the final authority on the status of deposits in banks and the financial relationship between banks and depositors.

8.    Whether the bankruptcy court erred in stating that the Bankruptcy Code, at 11 U.S.C. § 362(d)(1), provides that relief from the automatic stay may be granted for cause, which may include filing in bad faith.

9.    Whether the bankruptcy court erred in concluding that Anthony filed her bankruptcy petition in "bad faith" and whether it based that conclusion on incorrect assumptions of the factors in Anthony's case.

10.   Whether the bankruptcy court erred in its conclusion that Anthony signed a promissory note and a deed of trust with Cattle National.

11.   Whether the bankruptcy court erred in its conclusion that Cattle National has originals of a promissory note and a deed of trust signed by Anthony.

12.   Whether the bankruptcy court erred in showing bias against Anthony throughout the bankruptcy proceeding and in its ruling(s).

Case no. 4:12-cv-3124 filing 19 at 3-4; case no. 4:12-cv-3125 filing 10 at 3-4.

In case no. 4:12-cv-3126 (the appeal from the Edenton North order), Anthony raises these issues:

1. Whether Edenton North and its attorney of record violated Fed. R. Civ. P. 11(b), committed perjury, and committed fraud upon Anthony and upon the bankruptcy court in the filing of its proof of claim.

2. Whether the bankruptcy court erred in its failure to specify findings of facts and conclusions of law as required by Fed. R. Civ. P. 52.

3. Whether the bankruptcy court erred in its order which granted in part and denied in part Anthony's objection to Edenton North's proof of claim, erred in finding that Edenton North has a perfected "lien" for $288.28 against Anthony's real property, and erred in ignoring the fact that Anthony was never notified by Edenton North that it intended to file or had filed a "Notice of Lien" against Anthony's real property.

4. Whether the bankruptcy court erred in the aforesaid order by allowing the balance of Edenton North's claim as an "unsecured claim."

5. Whether the bankruptcy court erred in ignoring the fact that Edenton North was incorporated on June 20, 2002, more than a year after Anthony bought her real property, and erred in ignoring the fact that Edenton North was formed and operational on June 21, 2005, more than 4 years after Anthony bought her real property, and consequently has no standing against Anthony.

6. Whether the bankruptcy court erred in finding that Anthony had notice of the declaration of restrictive covenants filed by the developer of the real estate development in which Anthony resides, and erred in finding that covenants to pay dues run with the land and constitute a lien on the land.

7. Whether the bankruptcy court erred in determining that dues assessments were made by Edenton North and that Anthony was notified by Edenton North of such assessments.

8. Whether the bankruptcy court erred in ignoring the fact that the dues assessment of Edenton North is not in compliance with the declaration of restrictive covenants and consequently is unlawful.

9. Whether the bankruptcy court erred in ignoring the fact that federal disclosure laws require actual notice of material facts affecting ownership and cost of real property.

10. Whether the bankruptcy court erred in showing bias against Anthony throughout this bankruptcy proceeding and in this ruling.

Case no. 4:12-cv-3126 filing 13 at 3-4.

## III. STANDARD OF REVIEW

This Court reviews the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. *In re Armstrong*, 291 F.3d 517, 521-22 (8th Cir. 2002); *In re Papio Keno Club*, 262 F.3d 725, 728-29 (8th Cir. 2001); *Haden v. Pelofsky*, 212 F.3d 466, 470 (8th Cir. 2000); *see also* Fed. R. Bankr. P. 8013.

## IV. ANALYSIS

### A. JURISDICTIONAL ARGUMENTS

The Court will address each of the issues enumerated by Anthony. But before doing so, the Court addresses two other points raised by Anthony, which she implies are jurisdictional.[3]

#### 1. Copy of Oath

First, Anthony "demands" that the Court abide by its oath, and asks the Court to provide her with a "certified copy" of the oath "mandated by 5 U.S.C. § 3331." Case no. 4:12-cv-3124 filing 19 at 1.[4]

The Court does not need Anthony to remind it of its oath, or its duty to the Constitution, and given Anthony's apparent refusal to pay taxes, the Court questions Anthony's moral authority to lecture the Court about its civic

---

[3] The Court notes that some of the other arguments scattered throughout Anthony's briefs do not neatly fit within her statements of the issues presented, although it is sometimes difficult to tell. Anthony's arguments do not clearly track her stated issues. The Court will consider her jurisdictional arguments regardless. And because Anthony is acting *pro se*, the Court has also endeavored, where possible, to liberally construe both Anthony's statements of issues and her arguments, and draw connections where it can. *See United States v. Bates*, 561 F.3d 754, 758 n.3 (8th Cir. 2009). But, to the extent that the Court fails to address an argument that does not support a stated issue, that is because such argument has been waived. *See* Fed. R. Bankr. P. 8010(a)(1)(C); *see also In re Trans World Airlines*, 145 F.3d 124, 132-33 (3d Cir. 1998); *cf.* Fed. R. App. P. 28(a)(5).

[4] Many of Anthony's arguments are repeated among her three different briefs. To make things easier, the Court will generally cite to Anthony's brief in case no. 4:12-cv-3124 for these arguments.

7

responsibilities. Furthermore, the statute relied upon by Anthony, 5 U.S.C. § 3331 applies to those in the civil service or uniformed services, not to judicial officers. *United States v. Conces*, 507 F.3d 1028, 1041 (6th Cir. 2007). Beyond that, as the Sixth Circuit has persuasively explained,

> [w]hile federal judges have an analogous statutory obligation to take an oath before performing the duties of their office, see 28 U.S.C. § 453, nothing in this statute (or elsewhere in the law) requires that a district judge demonstrate to the satisfaction of a litigant in a particular case that he or she has taken this oath. Nor has [appellant] suggested any reason why a district court's subject matter jurisdiction over each case on its docket should hinge upon the district judge's ability or willingness to provide the parties with such proof of his or her compliance with § 453.

*Conces*, 507 F.3d at 1041. The Sixth Circuit characterized the appellant's argument as an "'urban legend,'" and found it to be frivolous. This Court agrees, and will discharge its legal duties without producing a "certified copy" of its oath. The Court's commission and oath are a matter of public record.

### 2. Bankruptcy Court Jurisdiction

Second, Anthony suggests that the bankruptcy court did not have jurisdiction because it is not an Article III court. "[A]s an administrative court," Anthony contends, the bankruptcy court did not "have the authority or jurisdiction to violate Anthony's protected rights under the Constitution" by, for instance, lifting the bankruptcy stay, or entering the other orders at issue. *E.g.,* case no. 4:12-cv-3124 filing 19 at 2-3.

Anthony misunderstands the nature of a bankruptcy proceeding. It is Anthony, and not her creditors, who filed a bankruptcy petition, and it is Anthony who is seeking relief from the bankruptcy court. There is no common-law or constitutional right to a bankruptcy stay, or to have one's debts discharged in bankruptcy—those remedies were created by Congress. The bankruptcy court exists to decide issues arising under the Bankruptcy Code, and because the existence of the remedy depends upon Congress' exercise of authority, Congress can limit the extent to which a judicial forum is available. *Stern v. Marshall*, 131 S. Ct. 2594, 2612 (2011). In other words, "Congress may set the terms of adjudicating a suit when the suit could not otherwise proceed at all." *Id.*

So, for instance, Congress *created* the remedy of the bankruptcy stay, and can condition that remedy (and vest authority to terminate it) however it likes. Among "core proceedings," the bankruptcy stay is among the closest to

the core. Stated another way—*of course* the bankruptcy court has jurisdiction to lift the bankruptcy stay, because that jurisdiction comes from the same authority that created the stay in the first place. Nor did the bankruptcy court, as Anthony asserts, "give away Anthony's property." Case no. 4:12-cv-3126 filing 13 at 21. It is, in fact, well established that a secured creditor need not even file a claim in a bankruptcy proceeding in order to preserve its lien. *In re Be-Mac Transport Co., Inc., 83 F.3d 1020, 1025 (8th Cir. 1996).* What the bankruptcy court did was deny relief to Anthony under the Bankruptcy Code—something that the court certainly had jurisdiction to do.

### B. Cattle National's Claim

Because Anthony's arguments in case nos. 4:12-cv-3124 and 4:12-cv-3125 are effectively identical, the Court will consider them together.

### 1. Refusal to Permit Discovery

Anthony's first argument is that the bankruptcy court erred in denying her discovery requests. She focuses on the bankruptcy court's order granting Cattle National's motion for a protective order from Anthony's discovery requests. The bankruptcy court determined that a protective order was appropriate because there was, at that time, no contested matter on file regarding Cattle National's claim. Case no. 4:12-cv-3124 filing 159 (text order). This was erroneous, Anthony argues, because she had filed a district court complaint and an adversary complaint against the bank. Case no. 4:12-cv-3124 filing 19 at 33.

Anthony's argument is without merit for two reasons. First, the bankruptcy court's ruling on a discovery motion is reviewed for an abuse of discretion. *See Ritchie Special Credit Invs., Ltd. v. U.S. Trustee, 620 F.3d 847, 853 (8th Cir. 2010).* Anthony has not shown an abuse of discretion because she has not articulated, in her brief to this Court, how she was prejudiced by the protective order. (And much of the material Anthony sought was utterly irrelevant, because it related to legal theories that, as will be explained below, have no basis in law.) Second, the bankruptcy court's finding was entirely accurate. Anthony was not entitled to discovery in the bankruptcy court proceeding just because she was litigating against Cattle National in *other* proceedings. If Anthony wanted discovery in the district court case or the adversary proceeding, those were the places to ask for it. The bankruptcy court did not abuse its discretion by, in effect, limiting discovery in this case to the issues being contested in this case.

## 2. Request for Formal Hearing

Anthony's second stated issue is whether the bankruptcy court erred in lifting the automatic stay without providing Anthony with a hearing on her objection to Cattle National's claim. *See* filing 200. But whether to hold an evidentiary hearing is within the discretion of the bankruptcy court and is reviewed for an abuse of discretion. *See, Tri-State Fin., LLC v. Lovald*, 525 F.3d 649, 655 (8th Cir. 2008); *In re Pierce*, 435 F.3d 891, 892 (8th Cir. 2006). There was no abuse of discretion here. The bankruptcy court held lengthy evidentiary hearings on Cattle National's request for relief from the automatic stay, at which Anthony had the opportunity to call witnesses and adduce evidence on the underlying claim. Case no. 4:12-cv-3124 filings 8 and 9. As these appeals demonstrate, Cattle National's motion for relief and Anthony's objection to Cattle National's claim present effectively the same issues. The bankruptcy court did not abuse its discretion in determining that another evidentiary hearing was unnecessary.

## 3. Federal Disclosure Laws

Anthony argued to the bankruptcy court that at the time of the loan, Cattle National failed to provide her with certain disclosures she claims were required by the Truth in Lending Act (TILA), 15 U.S.C. § 1601 *et seq.*, and the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2601 *et seq.* The bankruptcy court rejected that argument, finding that Anthony was not entitled to those disclosures because the loan was not a consumer loan. Filing 205 at 1. In support of her third stated issue, Anthony contests that conclusion, arguing that she had no construction experience and was not in the home construction business. Case no. 4:12-cv-3124 filing 19 at 11-15.

Anthony's argument is without merit. First, the bankruptcy court's factual finding is not clearly erroneous. Lavelle testified that the loan was made because Anthony planned to build on the then-vacant lot and sell the house for a profit. Case no. 4:12-cv-3124 filing 9 at 8, 24-25. Whether she had engaged in that business before is not pertinent to what was planned in the transaction at issue. If Anthony wanted to contradict Lavelle's testimony, she was free to be placed under oath and testify to her recollection of events. She did not, so Lavelle's testimony was uncontested. The only reasonable conclusion to be drawn from the evidence is that Anthony originally intended to build and sell the home for a profit, but that her plan did not work out.

Second, even if Anthony was entitled to TILA and RESPA disclosures, neither of those acts would provide her with the relief she is seeking here. She has made no allegations that would suffice to void the promissory note or deed of trust, and has alleged no damages that resulted from Cattle National's alleged lack of disclosure. In other words, she has not explained

what Cattle National failed to disclose that would have changed her conduct. TILA and RESPA are not lottery statutes—a creditor's failure to make required disclosures does not mean that the debtor wins a free house.

Specifically, under TILA, rescission is the only remedy, and even that is limited to a 3-year window that has already closed on Anthony. *See* 15 U.S.C. § 1635; *Beach v. Ocwen Federal Bank*, 523 U.S. 410, 417 (1998). "[TILA] permits no federal right to rescind, defensively or otherwise, after the 3-year period of § 1635(f) has run." *Beach, 523 U.S.* at 419. And even then, rescission may be conditioned upon the debtor's return of the borrowed principal. *Fed. Deposit Ins. Co. v. Hughes Dev. Co., Inc.*, 938 F.2d 889, 890 (8th Cir. 1991); *see also Yamamoto v. Bank of New York*, 329 F.3d 1167, 1171-72 (9th Cir. 2003) (collecting cases). In other words, even if TILA provided a remedy to Anthony, the only remedy it could provide would require her to return the money she borrowed—which she is clearly both unable and unwilling to do.

Similarly, RESPA specifically provides that nothing in it "shall affect the validity or enforceability of any sale or contract for the sale of real property or any loan, loan agreement, mortgage, or lien made or arising in connection with a federally related mortgage loan." 12 U.S.C. § 2615. In short, Anthony's underlying argument is that she does not have to repay Cattle National for the funds she was loaned—and neither TILA nor RESPA support such an argument. Anthony's third stated issue is without merit.

### 4. Overlooking "Discrepancies" in Loan Documents

Anthony devotes the bulk of her briefs to nitpicking both Cattle National's evidence and the bankruptcy court's findings. The Court will deal with her particular arguments, but as an overview, it is worth noting that the confusion of Cattle National's witnesses, when faced with Anthony's questions, was understandable. Anthony bombarded the witnesses with almost metaphysical questions such as "What is the definition of money?" and "Are checks money?" It would not be uncommon for a person who writes a check to think of that transaction as giving the recipient "money." This Court is not inclined to read too much into the witnesses' difficulty in dealing with Anthony's attempts to parse out the differences.[5]

Anthony's goal is apparently to prove that she does not owe Cattle National anything because it did not provide her with anything of "value." *See* case no. 4:12-cv-3124 filing 19 at 10. But Cattle National clearly did give something of "value": it extended a line of credit that Anthony used to build a

---

[5] Particularly because Anthony's theories were (and are) often baseless. For instance, Anthony's apparent belief that "cash," "money" and "Federal Reserve Notes" are completely different things is simply unsupported by law, conspiracy theories notwithstanding.

house, in exchange for her promise to pay it back. In a bankruptcy proceeding, the burden of proof is a substantive aspect of a claim, and is governed by state law. *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 20-21 (2000); *In re Reuter*, 686 F.3d 511, 515-16 (8th Cir. 2012). And in Nebraska, in an action on a promissory note, the party alleging want of consideration has the burden of proving it. *Caldwell v. Wells*, 117 N.W.2d 486, 487 (Neb. 1962); *Leach v. Treber*, 82 N.W.2d 544, 547 (Neb. 1957); *see also Schuelke v. Wilson*, 587 N.W.2d 369, 376 (Neb. 1998). "'Every negotiable instrument is deemed prima facie to have been issued for a valuable consideration; and every person whose signature appears thereon to have become a party thereto for value.'" *Leach*, 82 N.W.2d at 547. The bankruptcy court did not commit clear error in finding that Anthony failed to show Cattle National gave her nothing of value.

Anthony's reasoning to the contrary seems to go like this: Anthony gave Cattle National a promissory note, which was worth $285,000. Cattle National then gave funds back to Anthony. So, according to Anthony, Cattle National gave her nothing of "value," because it was really just giving her back the "value" she created.

This is little more than semantic gamesmanship. It is nonsensical to contend that a person can "create" money simply by promising to pay it to someone. Anthony didn't have a house on her lot, and then she did. That "value" came from someplace, and it wasn't the promissory note—Anthony could not have taken the promissory note down to Home Depot and started loading up building supplies. "'There are two kinds of consideration—that which confers a benefit upon the promisor and that which causes a detriment to the promisee. Either is a valid consideration which will support a contract.'" *Leach*, 82 N.W.2d at 547. But in this instance, Cattle National both conferred a benefit upon Anthony and caused a detriment to itself.

Anthony's next contention is that there was no proof Anthony signed the promissory note, or any of its amendments. The biggest problem with this contention is that at Anthony's deposition, she admitted signing the note. Filing 133 at 5-6. Anthony also points out that Lavelle did not actually see her sign any of the amendments and extensions to the promissory note. But Anthony's signature appears on the documents, there is no evidence that she did not sign them, and Anthony points to no authority suggesting that signatures are invalid unless there is a live witness to the signing. Simply put, Lavelle did nothing wrong, or even unusual, when he sent the documents to Anthony for her to sign and return to Cattle National. Anthony characterizes Lavelle's testimony as "uncorroborated hearsay." *E.g.*, case no. 4:12-cv-3124 filing 19 at 15-16. But it was not uncorroborated, because copies

12

of the documents were submitted, and it was not hearsay, because it was made in court under oath. *See* Fed. R. Evid. 801(c)(1).

Anthony also sets forth a "laundry list" of supposed factual errors made by the bankruptcy court. Most of those contentions have been discussed in other parts of this analysis, and will not be repeated here. But what bears closer examination is Anthony's argument that the bankruptcy court erred in finding no evidence that Cattle National acted fraudulently. It is in this context that Anthony most directly addresses the merits of Cattle National's claim, and raises her contention that she was defrauded because Cattle National violated federal banking law.

Anthony's argument is definitively without merit, for three reasons. First, as has been repeatedly explained to Anthony, there is no basis for a private suit based on the banking statutes she cites. *See, e.g., Anthony,* 684 F.3d 738; *see also, e.g., Lantry v. Wallace,* 182 U.S. 536, 551 (1901); *Farmers' Nat. Bank of Arkansas City, Kansas v. Robinson,* 176 U.S. 681, 682 (1900), *aff'g* 53 P. 762, 763 (Kan. 1898); *Gold-Mining Co. v. Nat. Bank,* 96 U.S. 640, 642 (1877). If those statutes are violated, it is "for the government, and not for the borrower, to complain of the bank's departure from the rule prescribed by statute"—just as only the Attorney General, and not private citizens, may prosecute violations of the criminal law. *See Lantry,* 182 U.S. at 551, citing *Scott v. Deweese,* 181 U.S. 202 (1901).[6]

Second, Anthony's arguments are based on a misunderstanding of the law she cites. She contends that national banks are not permitted to lend depositor funds. Case no. 4:12-cv-3124 filing 19 at 17. But the cases she cites only support the proposition that a national bank is not authorized to act as a *broker* in lending money to others—in other words, a bank may not lend money *on behalf of* a depositor without the depositor's permission, making that depositor (and not the bank) an involuntary creditor. *See Sullivan v. Arkansas Nat. Bank,* 2 S.W.2d 1096, 1098 (Ark. 1928), *citing Grow v. Cockrill,* 39 S.W. 60 (Ark. 1897); *see also Carr v. Weiser State Bank of Weiser,* 66 P.2d 1116, 1118 (Idaho 1937) (stating in dicta that a national bank may not loan money "for a depositor"). Even if the authority cited by Anthony remains good law, it would not apply here. National banks are clearly permitted to loan money from depositor funds, within limitations otherwise

---

[6] The Court notes that although Judge Smith Camp and the Eighth Circuit addressed this issue in terms of federal court jurisdiction, it would have been equally accurate to frame the issue as failure to state a claim for relief. *E.g., Adams v. Eureka Fire Protection Dist.,* 352 Fed. Appx. 137, 138-39 (8th Cir. 2009); *Cedar-Riverside Assocs., Inc. v. City of Minneapolis,* 606 F.2d 254, 255-59 (8th Cir. 1979). In other words, although the "quiet title" action was dismissed for lack of jurisdiction, the underlying reasoning would prevent Anthony from stating a claim for relief in state or federal court.

imposed by law. *See* [12 U.S.C. §§ 24](#) and [84](#). Nor did Cattle National unlawfully "lend credit" within the meaning of authority cited by Anthony—those cases stand for the proposition that a national bank cannot lend credit "by guaranteeing the debt of another." *E.g. [Norton Grocery Co. v. People's Nat. Bank of Abingdon, 144 S.E. 501, 503 (Va. 1928)](#)*. Even if that proposition remains valid, it would not apply here; national banks are obviously authorized to extend credit directly to borrowers. *See* [12 U.S.C. § 24](#).

And third, Anthony has no credible claim for fraud. Under Nebraska law, the elements of fraud are (1) a false representation of material fact, (2) knowledge that the representation was false or made in reckless disregard as to its truthfulness or falsity, (3) an intent to induce another to act, (4) a justifiable reliance on the representation, and (5) injury or damage resulting from such reliance. *[Knoell v. Huff, 395 N.W.2d 749, 757 (Neb. 1986)](#)*. Anthony has not identified a false representation made by Cattle National, and even if Cattle National's failure to disclose the source of the funds made available to Anthony can be construed as a "misrepresentation," it is simply not plausible that Anthony, when she borrowed the money, did so in reliance on the belief that depositor funds were not involved.

Anthony also asserts, vehemently, that a national bank may not secure a loan with real property. But as stated above, there is no private right of action to assert such a claim. Second, Anthony overlooks [12 U.S.C. § 371(a)](#), which plainly provides that "[a]ny national banking association may make, arrange, purchase or sell loans or extensions of credit secured by liens on interests in real estate . . . ." *See also, [First Nat. Bank v. City of Hartford, 273 U.S. 548, 560 (1927)](#); [First Nat. Bank of Guthrie Center v. Anderson, 269 U.S. 341, 353-54 (1926)](#)*. And third, even if Anthony was correct about Cattle National's authority, that would not support the relief she seeks—"the borrower cannot escape liability for the repayment of the money so borrowed, nor dispute the right of the bank to enforce the security taken in violation of the statute." *[Lantry, 182 U.S.](#)* at 551; *see also [Gold-Mining Co., 96 U.S.](#)* at 642. In other words, as with TILA and RESPA, even if Cattle National had exceeded its lawful authority, that would not entitle Anthony to a free house.

5. Granting Bank Relief from Stay while Staying Adversary Proceeding

As her fifth stated issue, Anthony argues that the bankruptcy court should not have granted Cattle National relief from the bankruptcy stay while at the same time staying her adversary proceeding. Anthony claims that she was denied due process in the adversary proceeding. But Anthony's appeals were not taken from the adversary proceeding, and any orders issued in that proceeding are not at issue here. And in any event, Anthony was not prejudiced by the stay in the adversary proceeding—the Eighth Circuit's

affirmance of the district court's order in the "quiet title" case makes it abundantly clear that the bankruptcy court also lacked jurisdiction over Anthony's nearly identical adversary complaint. *See Anthony*, 684 F.3d 738.

### 6.  Private Right of Action Under Federal Banking Laws

Anthony's sixth stated issue is whether the bankruptcy court erred in ruling that no private right of action is available for the national banking laws that Anthony claims were violated. For the reasons explained above, Anthony's argument in this regard is without merit.

### 7.  Reliance on Michie on Banks and Banking

As her seventh stated issue, Anthony contends that the bankruptcy court erred in relying on a treatise, Michie on Banks and Banking, for the general proposition that a bank depositor is a creditor, and that the money deposited becomes available to the bank for use in its business. Filing 201 at 2-3, citing 7 Michie on Banks and Banking § 178 at 393 (1999). Anthony complains that "[t]he LAW is the final authority, no book has EVER been recognized as LAW and never will be." Case no. 4:12-cv-3124 filing 19 at 25.

Anthony's argument has no merit. As explained above, both statutes and case law support the proposition for which the bankruptcy court cited this treatise. And while treatises are not "law," they are often helpful in explaining the law, even to experienced practitioners. Anthony herself relies upon secondary sources in support of other aspects of her argument. *E.g.* case no. 4:12-cv-3126 filing 13 at 13, citing Am. Jur. 2d Liens § 12. In particular, the treatise criticized by Anthony here is venerable and respected, and has been cited repeatedly in case law, including one of the cases upon which Anthony placed great (if mistaken) reliance. *See Norton Grocery Co.*, 144 S.E. at 503; *see also, e.g., First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 778 n.14 (1978); *Citizens and S. Nat. Bank v. Bougas*, 434 U.S. 35, 39-40 (1977); *First Nat. Bank in Plant City, Fla. v. Dickinson*, 396 U.S. 122, 136 n.9 (1969); *McGrath v. Mfrs. Trust Co.*, 338 U.S. 241, 250 n.13 (1949).

### 8.  Relief from Automatic Stay for Filing in Bad Faith

Next, Anthony claims that the bankruptcy court erred in stating that relief from the automatic stay may be granted when a petitioner has filed in bad faith. "On request of a party in interest and after notice and a hearing," a bankruptcy court may provide relief from the bankruptcy stay "for cause, including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. § 362(d)(1). The statute, Anthony notes, does not contain the term "bad faith." Case no. 4:12-cv-3124 filing 19 at 26.

But the statute does provide that relief from the stay may be granted "for cause," and it is well established that a bad-faith filing may constitute "cause" for relief. *See Raleigh, 530 U.S.* at 25; *see also, e.g., In re Laguna Assocs. Ltd. P'ship, 30 F.3d 734, 737 (6th Cir. 1994)* (collecting cases); *In re Dixie Broadcasting, Inc., 871 F.2d 1023, 1026 (11th Cir. 1989).* The bankruptcy court did not err in concluding that whether Anthony's petition was filed in good faith was pertinent to Cattle National's motion for relief from the bankruptcy stay.

9. Finding that Anthony Filed Bankruptcy Petition in Bad Faith

Anthony also takes issue with the bankruptcy court's finding that her bankruptcy petition was filed in bad faith. Case no. 4:12-cv-3124 filing 19 at 27-31. The court applied the eight-factor test set out by *In re Laguna Assocs. Ltd. P'ship, 30 F.3d* at 738:

> While no single fact is dispositive, courts have found the following factors meaningful in evaluating an organizational debtor's good faith:
>
> > (1) the debtor has one asset;
> > (2) the pre-petition conduct of the debtor has been improper;
> > (3) there are only a few unsecured creditors;
> > (4) the debtor's property has been posted for foreclosure, and the debtor has been unsuccessful in defending against the foreclosure in state court;
> > (5) the debtor and one creditor have proceeded to a standstill in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford;
> > (6) the filing of the petition effectively allows the debtor to evade court orders;
> > (7) the debtor has no ongoing business or employees; and
> > (8) the lack of possibility of reorganization.

The bankruptcy court, applying those factors, found that Anthony's bankruptcy petition had been filed in bad faith. Anthony takes issue with that finding, and the court's application of each factor.

Whether the bankruptcy stay should be lifted in each case lies in the sound discretion of the bankruptcy court. *Small Bus. Admin. v. Rinehart, 887 F.2d 165, 169 (8th Cir. 1989); see also Raleigh, 530 U.S.* at 25. Because there is no clear definition of what constitutes "cause," discretionary relief from the

stay must be determined on a case by case basis. *In re Laguna Assocs. Ltd. P'ship*, 30 F.3d at 737; *In re Mac Donald*, 755 F.2d 715, 717 (9th Cir. 1985). The bankruptcy court abuses its discretion only when its discretion relies upon a clearly erroneous finding of fact or fails to apply the proper legal standard. *Ritchie*, 620 F.3d at 853. And whether a bankruptcy case has been filed in good faith is a question of fact. *In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 379 (8th Cir. 2000). With those principles in mind, the Court will consider Anthony's arguments with respect to each of the *Laguna* factors.

### a. Debtor has One Asset

The bankruptcy court found that this was "a one-asset case, the house. Basically all of the other assets, including individual retirement accounts, have been claimed as exempt." Filing 201 at 4. Anthony disagrees, and identifies a couple of other financial accounts that she says are not exempt. Case no. 4:12-cv-3124 filing 19 at 27. But at least insofar as Cattle National's claim is concerned, this is a one-asset case, because only the house has sufficient value to satisfy Cattle National's claim. The bankruptcy court did not err in finding this factor applicable.

### b. Improper Pre-petition Conduct

The bankruptcy court found Anthony's pre-petition conduct to be improper because she "filed a pre-petition lawsuit based on an erroneous view of federal banking law in an attempt to stop the sale of the house and trying to avoid paying the debt that she contracted for." Filing 201 at 4. Anthony, the court noted, had lived in the house for 5 years without complaining about the source of the funds used to build it, then filed an appeal of the district court order and filed her bankruptcy petition on the day of the scheduled sale of the house. Filing 201 at 4.

Anthony complains that it was not "proper" for the bankruptcy court to "pre-judge and offer an opinion" on the district court case. Case no. 4:12-cv-3124 filing 19 at 27. But the court did not "pre-judge" the case; the court *judged* the case, which is what judges do. The bankruptcy court questioned whether Anthony had made a good-faith effort to pay her debts, and why Anthony was willing to tolerate Cattle National's supposed "fraud" so long as Cattle National was not enforcing its legal right to recover on its security. And the bankruptcy court was right to question that conduct.

### c. Number of Unsecured Creditors

The bankruptcy court found that there were only one or two unsecured creditors in this case. Filing 201 at 4. For the most part, Anthony does not dispute that fact. She seems to be arguing that this factor should not be

considered—that is, that the number of unsecured creditors is not an indicium of bad faith. Case no. 4:12-cv-3124 filing 19 at 28-29. But Anthony is missing the point. The number of unsecured creditors does not, by itself, prove bad faith—but no single factor does. *See In re Laguna Assocs. Ltd. P'ship*, 30 F.3d at 738; *see also In re Dixie Broadcasting, Inc.*, 871 F.2d at 1027. And as will be explained in more detail below, one of the primary purposes of the bankruptcy stay is to protect both debtor and creditors from the chaos of creditors "racing to various courthouses to pursue independent remedies to drain the debtor's assets." *Dean v. Trans World Airlines, Inc.*, 72 F.3d 754, 755-56 (9th Cir. 1995). A debtor who does not face such a scramble, because the number of unsecured creditors is low, has less need for bankruptcy protection, which suggests that the bankruptcy petition may not have been filed for legitimate reasons.

This case illustrates that principle—there is nothing to suggest that Anthony faced significant collection efforts from her creditors, other than Cattle National—which in turn suggests that the bankruptcy petition was filed as a tactic in Anthony's ongoing dispute with Cattle National. The bankruptcy court did not err in considering this factor.

### d. Debtor's Property Posted for Foreclosure

The bankruptcy court noted that the property was scheduled for sale when Anthony was unsuccessful in stopping the sale with her district court lawsuit. Filing 201 at 4. Anthony points out that her district court case was dismissed without prejudice. Case no. 4:12-cv-3124 filing 19 at 29. But Anthony is, again, missing the point. The point is that she was facing the sale of the property and had been unsuccessful, in another legal proceeding, in preventing the sale. It is also well established that the timing of the petition may suggest bad faith, *see In re Dixie Broadcasting, Inc.*, 871 F.2d at 1027, and the timing here could not be more suspicious. This suggests that the bankruptcy petition was filed simply because other legal strategies had failed, and the bankruptcy court correctly considered it.

### e. Debtor and Creditor Have Reached Standstill in Other Litigation

The bankruptcy court also observed that Anthony and Cattle National had proceeded to a standstill in other litigation. Filing 201 at 4. Anthony's objection, repeated elsewhere, is that the *Laguna* court referred specifically to a debtor's failure to defend "in state court" and a debtor-creditor standstill "in state court litigation." *In re Laguna Assocs. Ltd. P'ship*, 30 F.3d at 737. Anthony accuses the bankruptcy court of overlooking the words "state court." Case no. 4:12-cv-3124 filing 19 at 29.

But the important point here is not whether the parties are litigating in state or federal court. The *Laguna* court simply referred to "state court" because that is where property disputes such as "quiet title" complaints are generally litigated. (As evidenced by the fact that Anthony's district court case was dismissed for lack of federal jurisdiction.) It is well understood that a petition "filed strictly to circumvent pending litigation" shows an "'intent to abuse the judicial process.'" *In re Dixie Broadcasting, Inc.*, 871 F.2d at 1027. That is true whether the pending litigation is in state or federal court.

### f. Filing Allows Debtor to Evade Court Orders

The bankruptcy court noted that the bankruptcy petition "effectively trumped the effect of the debtor losing her federal court lawsuit in which she had requested an injunction to stop the sale." Filing 201 at 4. Anthony claims that she "knows of no court orders that were 'evaded.'" Case no. 4:12-cv-3124 filing 19 at 30. This Court is not sure what Anthony understands the word "evaded" to mean, but there is nothing in the bankruptcy court's finding that is not literally true.

Anthony also generally appeals to what she believes to be the purpose of bankruptcy procedures: "to reorganize, get back on one's financial feet, pay most debts and move on!" Case no. 4:12-cv-3124 filing 19 at 29. And Anthony asks, "If this bank is NOT stealing Anthony's home by deception and fraud, isn't it in the best interest of the bank to allow Anthony to work out the loan?" Case no. 4:12-cv-3124 filing 19 at 29-30.

But the purpose of bankruptcy proceedings, as intimated above, is more than just the protection of the debtor. Bankruptcy, particularly the automatic stay, preserves the debtor's assets *for repayment*, *see In re Mac Donald*, 755 F.2d at 717, which is what Cattle National is seeking. The purpose is to protect both debtors and creditors by preventing a "'chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts.'" *Hunt v. Bankers Trust Co.*, 799 F.2d 1060, 1069 (5th Cir. 1986). In short, it balances the interests of the creditors and the debtor. *In re Indian Palms Assocs., Ltd.*, 61 F.3d 197, 206 (3d Cir. 1995); *see also Dean*, 72 F.3d at 755-56. Creditors have rights too, and Anthony cannot complain that her rights have been violated just because her creditors' have been protected.

### g. Debtor's Ongoing Business or Employees

As the bankruptcy court noted, Anthony has no ongoing business or employees. Filing 201 at 4. Anthony points to a military pension she says will start in May 2013. Anthony also seems to dispute the relevance of an ongoing business to a petitioner's good faith. Case no. 4:12-cv-3124 filing 19 at 30.

The Court will address the significance of Anthony's pension shortly. The reason an ongoing business might be relevant is because the inquiry into a petitioner's bad faith is essentially an inquiry into why the petitioner filed for bankruptcy. An ongoing business with employees would be suggestive of good faith, because protecting ongoing business operations is one of the paradigmatic uses of the bankruptcy stay. Here, Anthony had no such interests to protect—which suggests, again, that Anthony's bankruptcy petition was primarily intended to take a dispute between two parties and move it from one unavailing forum to another.

### h. Possibility of Reorganization

Finally, the bankruptcy court found that Anthony had "insufficient income to propose a viable [reorganization] plan in a reasonable time." The evidence, the court found, showed that Anthony "has very little income, not even enough to require her to file federal income tax returns for the last two years."[7] Filing 201 at 4. Anthony again points to her future military pension, which she contends will amount to $2,000-$2,200 per month. Case no. 4:12-cv-3124 filing 19 at 30.

But Anthony does not explain how her military pension supports a "viable" plan in a "reasonable" time. Anthony borrowed from Cattle National under what was supposed to be a relatively short-term construction loan. Even if Anthony's *entire* pension was devoted to repayment, it would take years, and not start until next May. There is no basis in law for compelling Cattle National to surrender its security for a *secured debt* and accept a delayed, piecemeal, long-term repayment from a debtor whose ability and inclination to repay that debt are highly questionable. And more to the point, Anthony's failure to propose a viable reorganization plan again suggests that a good-faith attempt at reorganizing was not the motive for her petition.

### i. Ultimate Finding of Bad Faith

After discussing all those factors, the bankruptcy court found that Anthony's conduct supported a finding of bad faith, and relief from the automatic stay. Filing 201 at 4-5. As noted above, whether a bankruptcy case

---

[7] This Court sees no need to determine whether Anthony was actually not under a legal obligation to file tax returns. The Court notes, however, that some of Anthony's arguments, below and in this Court, resemble "tax protestor" theories that have been soundly rejected by the courts. *See* case no. 4:12-cv-3124 filing 8 at 24; *compare, e.g., Walbaum v. C.I.R., 387 Fed. Appx. 668, 669 (8th Cir. 2010); United States v. Beale, 574 F.3d 512, 518-19 (8th Cir. 2009)*. This suggests another possible explanation for Anthony's failure to file tax returns or report income. But for purposes of this case, the Court can only accept Anthony's reported self-income at face value.

has been filed in good faith is a question of fact, which we review for clear error. *In re Cedar Shore Resort, Inc.*, 235 F.3d at 379. That standard of review is very deferential to the trial court's judgment. "'To be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish.'" *In re Papio Keno Club*, 262 F.3d at 729. In this case, the bankruptcy court's conclusion was not clearly erroneous, and the Court finds no merit to Anthony's ninth stated issue.

### 10.  Evidence Anthony Signed Note and Deed of Trust

Anthony's next argument is that the bankruptcy court erred in finding that she actually signed the promissory note and deed of trust. Anthony contends that in order to prove its claim, Cattle National was required to present the original, "blue ink" signed documents. Anthony argues that because it did not, the bankruptcy court should not have accepted the documents into evidence, and that the evidence supporting Cattle National's claim is legally insufficient. Case no. 4:12-cv-3124 filing 19 at 10-11, 15-17, 32.

A bankruptcy court's evidentiary rulings are reviewed for an abuse of discretion, according substantial deference to the bankruptcy court's rulings. *See, United States v. Van Elsen*, 652 F.3d 955, 958 (8th Cir. 2011); *First Investors' Trust v. Tarkio Coll.*, 129 F.3d 471, 476 (8th Cir. 1997). There was no abuse of discretion here, nor is the bankruptcy court's conclusion that Anthony signed the documents at issue clearly erroneous.

First, as noted above, Anthony admitted that she signed the promissory note. Filing 133 at 5-6. Beyond that, Anthony's understanding of the rules of evidence is simply wrong. The Federal Rules of Evidence apply in cases under the Bankruptcy Code. Fed. R. Bankr. P. 9017. And under those rules, "A duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." Fed. R. Evid. 1003. Anthony has not raised a *genuine* question. She presented no evidence suggesting that the copies were inaccurate or that the original documents were inauthentic. In the absence of such evidence, the Federal Rules of Evidence pointedly do *not* require original documents. *Id*. Nor does the Uniform Commercial Code, upon which Anthony also relies. *See* Neb. Rev. Stat. U.C.C. § 3-308(a) (signature is presumed to be authentic and authorized).

21

And Fed. R. Bankr. P. 3001(c)(1) provides that when a claim is based on a writing, "the original *or a duplicate* shall be filed with the proof of claim."[8] (Emphasis supplied.) Submitting a duplicate is clearly an option. And the official proof of claim form actually instructs claimants to "not send original documents, as attachments may be destroyed after scanning." Fed. R. Bankr. P. Form 10. Cattle National was, in fact, following instructions when it submitted copies of the relevant documents.

In short, the bankruptcy court did not err in admitting Cattle National's exhibits into evidence, nor is there any merit to Anthony's argument that the original documents were required. In the absence of any *evidence* suggesting that the copies provided by Cattle National were not true and accurate, those copies were sufficient for Cattle National's proof of claim.

Anthony puts a different spin on this argument in her reply brief. She has belatedly discovered that a proof of claim, properly executed and filed, is prima facie evidence of the validity and amount of the claim, creating a presumption that the claim is valid. Fed. R. Bankr. P. 3001(f). But, she contends, prima facie evidence is only sufficient until "'rebutted or contradicted.'" Case no. 4:12-cv-3125 filing 15 at 4, citing Black's Law Dictionary 1353 (4th ed. 1971). She argues that once she "challenged" Cattle National's proof, it was required to produce the original documents. Case no. 4:12-cv-3125 filing 15 at 4.[9]

Anthony's argument will not avail her, for three reasons. First, her consistent position, both in bankruptcy court and her appellant's brief to this court, has been that Cattle National failed to make the initial showing required of it. The Court is not persuaded that she should be permitted to shift her position at this juncture. But beyond that, Anthony's argument lacks merit. Anthony did not present evidence that rebutted or contradicted the showing made by Cattle National's proof of claim—she did not refute Cattle National's prima facie case simply by disagreeing with it. And finally, even had Anthony managed to rebut Cattle National's prima facie case in some way, that would not give rise to a burden to produce the original documents in the absence of evidence suggesting that the copies were not true and accurate, as explained above. Simply put, Cattle National's evidence was sufficient to make its prima facie case, and Anthony did not rebut it.

---

[8] Effective December 1, 2012, the rule will be even more clear: it will instruct parties to file "a copy" of the document; the rule was amended "to reflect the current practice of filing only copies." Fed. R. Bankr. P. 3001 advisory committee's note.

[9] Anthony also briefly argues that she should not have carried the burden of showing that the debt was invalid. Case no. 4:12-cv-3125 filing 15 at 4. Anthony's misunderstanding of the burden of proof in bankruptcy proceedings will be addressed below in the context of Edenton North's claim.

11.  Finding that Cattle National Retained Original Documents

Anthony's penultimate issue with respect to Cattle National's claim is whether the bankruptcy court erred in concluding that Cattle National retained the original note and deed of trust. Although this is similar to Anthony's last argument, the point seems to be slightly different: Anthony seems to be questioning Cattle National's proof that it *still* retained the note and deed of trust, *i.e.,* proof that Cattle National had not assigned the note. Case no. 4:12-cv-3124 filing 19 at 17.

But Lavelle declared, under penalty of perjury, that Cattle National was the current holder of the note. Filing 118. There is no evidence to suggest otherwise. Contrary to Anthony's apparent belief, testimony given under oath or threat of perjury is "evidence" that supports a claim. Cattle National's evidence here was sufficient, and the bankruptcy court's conclusion to that effect was not clearly erroneous.

Anthony also asserts, in this context, that Cattle National has stolen her property by retaining the promissory note. Case no. 4:12-cv-3124 filing 19 at 32. Anthony contradicts herself by arguing, in effect, "There's no proof that Cattle National has the promissory note, but they should give it back." There is also some contradiction in Anthony claiming that she is entitled to possession of both the promissory note and the house—even under Anthony's novel theory that she financed the home's construction with the value of the promissory note, she could not be entitled to both the house and the instrument with which she claims she paid for the house.

But beyond that, Anthony simply misunderstands the nature of a promissory note. What gives a note value—what makes it negotiable—is not the ink on the paper. It is the promise of the debtor to repay the sum the note represents. The note has little commercial value when, as here, the debtor has clearly defaulted on that promise. And after the sale of trust deed property, the proceeds of the sale are applied to the obligation secured by the deed, meaning that the debtor's obligation to repay (and thus, the value of the note) will be mostly or fully discharged. *See* Neb. Rev. Stat. §§ 76-1011 and 76-1013; *see also Pantano v. Maryland Plaza P'ship, 507 N.W.2d 484 (Neb. 1993).* If the note has been discharged, then it is valueless; if it has not, then Anthony will still owe Cattle National money on the note. Anthony's claim that Cattle National "has now stolen two of Anthony's assets" is simply wrong. Case no. 4:12-cv-3124 filing 19 at 32. It was Anthony who kept the proceeds of a bank loan without the repayment she had promised, and Cattle National was within its rights to enforce its security interest in order to recover what it was owed.

12. Due Process

Anthony's final issue with respect to Cattle National's claim is that she was denied due process of law. Case no. 4:12-cv-3124 filing 19 at 37-40. Anthony's due process argument is not precisely framed—for the most part, she just lists the "unalienable rights" she claims she has been denied. Case no. 4:12-cv-3124 filing 19 at 37-38. Many of the particular ways she claims that happened have been addressed above, and others will be addressed below. But the heart of Anthony's argument seems to be that she did not knowingly and voluntarily waive her rights.

Anthony has not, however, identified any action on the part of Cattle National that could be described as a constitutional violation, given that Cattle National is not a state actor. *See generally American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40 (1999); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149 (1978). Anthony has presented no evidence suggesting that she lacked capacity to enter into the promissory note or the trust deed at the time she executed them, which means she is charged with knowledge of their provisions. *See generally Gonzalez v. Union Pac. R.R. Co.*, 803 N.W.2d 424, 435 (Neb. 2011). Anthony has not identified any way in which Cattle National's actions were contrary to the terms of those agreements. Nor does Anthony present any basis to conclude that the Nebraska Trust Deeds Act is unconstitutional. *See generally Blair Co. v. Am. Sav. Co.*, 169 N.W.2d 292, 294 (Neb. 1969).

Anthony also contends that the bankruptcy court judge was "intimidating and derisive to Anthony in multiple court hearings." Case no. 4:12-cv-3124 filing 19 at 39. The record does not support her argument. The bankruptcy court sometimes prevented Anthony from pursuing irrelevant inquiries, and informed Anthony—sometimes bluntly—that her arguments lacked legal merit. Anthony also asserts that the judge ruled against her on "every single major issue" before the bankruptcy court. Case no. 4:12-cv-3124 filing 19 at 39 (emphasis omitted). But this is not a game of chance—there is no expectation that a court's rulings should be distributed randomly. The court's rulings were, as explained above, correct—the court ruled against Anthony most of the time because the evidence and the law favored Cattle National's claim. The record simply does not show that the court was biased.

## C.  Edenton North's Claim
### 1. Alleged Perjury and Fraud in Proof of Claim

Anthony's first issue with respect to Edenton's North's claim is that Edenton North's counsel, according to Anthony, committed "perjury" and "fraud" in filing Edenton North's proof of claim. Case no. 4:12-cv-3126 filing 13 at 8-11. Anthony points to several facts stated on the proof of claim that

she says are inaccurate. According to Anthony, Edenton North's counsel "should be sanctioned by this Court and [Edenton North's] claim should be dismissed." Case no. 4:12-cv-3126 filing 13 at 11. Some of the statements pointed to by Anthony are inaccurate, but most are not. Most of them are based in Anthony's misunderstanding of the word "lien," which will be addressed below. Others are based in the fact that Edenton North presented its entire claim as a secured claim when, as the bankruptcy court found, most of the claim was unsecured. (Edenton North has not cross-appealed.)

Anthony refers to Fed. R. Civ. P. 11(b), which provides that an attorney who files a document with the Court is certifying, among other things, that its factual contentions have evidentiary support and that the claim is warranted by law.[10] But a proof of claim is not false simply because it may be inaccurate or erroneous. A claim might have been asserted by a creditor in good faith even if the claim was later successfully disputed by the debtor or disallowed by the bankruptcy court. See In re Fordu, 201 F.3d 693, 711 (6th Cir. 1999); Fed. R. Bankr. P. 9011(b); cf. United States v. Overmyer, 867 F.2d 937, 950 (6th Cir. 1989). And although Anthony cites Fed. R. Civ. P. 11(b), she apparently overlooked Fed. R. Civ. P. 11(c), and did not comply with its procedural requirements for seeking sanctions. Compare Fed. R. Civ. P. 11(c) and Fed. R. Bankr. P. 9011(c); see Gordon v. Unifund CCR Partners, 345 F.3d 1028, 1029-30 (8th Cir. 2003).[11]

Anthony also accuses Edenton North's counsel of perjury.[12] As with civil sanctions, such a charge would require proof that the untruth was knowingly false. See Aronofsky v. Bostian, 133 F.2d 290, 292 (8th Cir. 1943); see also United States v. Martellano, 675 F.2d 940, 942 (7th Cir. 1982); cf. Bronston v. United States, 409 U.S. 352 (1973). And even if such proof existed (and it is not to be found in this record), there is no private cause of action for perjury, so Anthony cannot obtain relief by raising it. See, Fuller v. Unknown Officials, 387 Fed. Appx. 3, 4 (D.C. Cir. 2010); Kafele v. Frank & Wooldridge Co., 108 Fed. Appx. 307, 308-09 (6th Cir. 2004).

---

[10] Anthony cites Fed. R. Civ. P. 11; the applicable bankruptcy rule, Fed. R. Bankr. P. 9011, is analogous. In re Mahendra, 131 F.3d 750, 759 (8th Cir. 1997).

[11] In her reply brief in the Cattle National appeal, Anthony makes similar accusations against Cattle National's counsel, based on purported misstatements of fact and law in Cattle National's brief, and asks that Cattle National's counsel be sanctioned. Case no. 4:12-cv-3125 filing 15 at 4-9. Anthony has again neglected to follow the procedures for seeking sanctions from an opposing party. Beyond that, the Court has reviewed Anthony's accusations and finds nothing there that would affect its disposition of these appeals. The Court's disposition of these appeals is based solely upon the merits of Anthony's case.

[12] The applicable criminal charge would be 18 U.S.C. § 152(4), which prohibits "knowingly and fraudulently present[ing] any false claim for proof against the estate of a debtor."

25

In short, Anthony's complaints about the factual allegations in Edenton North's proof of claim simply go to the merits of Anthony's objection, which will be discussed below. Anthony's first issue has no merit.

### 2. Fed. R. Civ. P. 52

Anthony complains that the bankruptcy court's order on her objection to Edenton North's claim failed to comply with Fed. R. Civ. P. 52(a)(1), which provides that "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately." Case no. 4:12-cv-3126 filing 13 at 11.

Anthony's argument is without merit, for three reasons. First, Fed. R. Civ. P. 52 did not apply to these proceedings—the Federal Rules of Civil Procedure apply to bankruptcy proceedings only to the extent provided by the Federal Rules of Bankruptcy Procedure, Fed. R. Civ. P. 81(a)(2), and Fed. R. Civ. P. 52 has only been extended to bankruptcy in adversary proceedings. Fed. R. Bankr. P. 7052. Second, even if Fed. R. Civ. P. 52 applied in bankruptcy, it would not apply to the order at issue because Anthony's objection did not present an "action tried on the facts." *See Assoc. Elec. Coop., Inc. v. Mid-America Transp. Co., 931 F.2d 1266, 1272 (8th Cir. 1991)*. And third, even if the bankruptcy court was required to comply with Fed. R. Civ. P. 52(a)(1) and failed to do so, remand for specific findings would be unnecessary if a complete understanding of the issues may be had without the aid of separate findings, and if the record would not support a finding in the appellant's favor, which is certainly the case here. *See Jenkens & Gilchrist v. Groia & Co., 542 F.3d 114, 118 (5th Cir. 2008)*.

### 3. Finding Edenton North Had "Lien"

Anthony argues at length that Edenton North does not have a lien on her property. Case no. 4:12-cv-3126 filing 13 at 9,11-13. Anthony seems to be advancing three reasons why: she claims that there is no proof of a lien, she claims not to have been notified of the lien, and she claims that no lien could have been created without her knowledge and consent. None of these arguments have merit.

First, and most fundamentally, Anthony seems to misunderstand the nature of a lien. She admits that Edenton North presented a "'Notice of Lien'" but insists that "[a] 'Notice of Lien' is NOT a lien." Case no. 4:12-cv-3126 filing 13 at 12. She seems to believe that Edenton North's claim required it to present a piece of paper that purported to be a "lien." But a lien is not a piece of paper, although it can be created by a document. A lien is, generally speaking, a legal right or interest in another's property. *See, United States v. Reed, 668 F.3d 978, 982 (8th Cir. 2012); West Town Homeowners Ass'n v.*

_Schneider_, 435 N.W.2d 645, 648 (Neb. 1989); 11 U.S.C. § 101(37); Black's Law Dictionary 941 (8th ed. 2004). In other words, a "lien" is a legal right, not a tangible object. Edenton North presented evidence of its lien by providing the legal documents that gave rise to its legal right against Anthony's property.

Second, Anthony seems to be confusing notice of the lien with notice of the underlying obligation. Anthony did not present evidence that she was not properly billed for her homeowners' association dues. And a lien for unpaid homeowners' association dues is perfected by filing a notice with the register of deeds. Neb. Rev. Stat. 52-2001(1).[13] Notice of the lien was provided in accord with Nebraska law.

And third, liens can be created without consent, by operation of law. The very authority relied upon by Anthony explains this.

> _In the absence of a lien given by law_, neither party can create one without the consent or agreement of the other, nor may a lien be created on property without the knowledge or consent of its owner_, but the consent of an owner may not be necessary to the creation of a lien on his or her property by law._
>
> Generally, a lien can be created only with the owner's consent, that is, by a contract express or implied with the owner of the property or with some one by him or her duly authorized, _or without his or her consent by the operation of some positive rule of law, as by statute._

Am. Jur. 2d Liens § 12 (emphasis supplied); _compare_ case no. 4:12-cv-3126 filing 13 at 13. In this case, Edenton North's lien was created by operation of law, because of Edenton North's restrictive covenant. _See_ § 52-2001(1); _see also, Regency Homes Ass'n_, 498 N.W.2d at 793; _West Town Homeowners Ass'n., Inc._, 435 N.W.2d at 649. Anthony's consent was not required.

Anthony also makes passing references to the fact that Edenton North had not obtained a judgment against her. _E.g._, case no. 4:12-cv-3126 filing 13 at 12. Anthony points to no authority suggesting that a creditor must be a _judgment_ creditor to present a claim in a bankruptcy proceeding, nor is a

---

[13] The Court notes that § 52-2001 was enacted in 2010. But Anthony does not complain about the bankruptcy court's reliance on it, and it may even have worked to Anthony's advantage, because it was the statute that convinced the bankruptcy court to only allow part of Edenton North's claim to be secured. Filing 203 at 2. In any event, it does not appear that the statute's provisions with respect to the creation of a homeowners' association lien differ materially from common law. _See, Regency Homes Ass'n v. Egermayer_, 498 N.W.2d 783, 793 (Neb. 1993); _West Town Homeowners Ass'n., Inc._, 435 N.W.2d at 649.

judgment lien the only kind of lien. And finally, Anthony makes reference to the doctrine of exhausting administrative remedies, which she says Edenton North failed to do. Case no. 4:12-cv-3126 filing 13 at 13. But Edenton North had no available administrative remedies: it had no dispute with an administrative agency, and there is no government administrative agency charged with resolving Edenton North's dispute with Anthony. *See generally* *Woodford v. Ngo*, 548 U.S. 81, 88-89 (2006) (explaining basis of doctrine).

### 4. Allowing Balance of Claim as Unsecured Claim

Anthony's next stated issue is whether the bankruptcy court erred in allowing the balance of Edenton North's claim as an unsecured claim. Anthony's argument here is, again, that Edenton North did not present a judgment or "a document purporting to be a 'LIEN'." Case no. 4:12-cv-3126 filing 13 at 15. But the fact that Edenton North did not perfect a lien for the full amount of its claim is precisely why the bankruptcy court only allowed part of the claim to be secured. Whether Edenton North perfected a lien for the full amount of its claim goes to whether the claim is secured or unsecured—not the validity of the underlying debt. And as noted above, Anthony can point to no authority requiring that a debt be reduced to judgment before it can be claimed in a bankruptcy proceeding. Anthony's argument is without merit.

### 5. Edenton North's Incorporation After Anthony's Real Estate Purchase

Anthony contends that Edenton North has no standing because it did not exist when Anthony purchased her lot in 2001. Case no. 4:12-cv-3126 filing 13 at 15. Her argument is that Edenton North could not assess dues against her because it was not incorporated until 2002 and was not operational until 2005. Filing 176 at 2.

But the restrictive covenants which gave rise to Edenton North were recorded in 2000, well before Anthony purchased the lot. Filing 60. And those covenants set forth a process not uncommon in residential development: the restrictive covenants were created and recorded by the owner/developer of the subdivision (with the approval of the Lincoln City Attorney's office), and control was handed off to the homeowners' association after development of the subdivision was sufficiently complete. *See* filing 60. The powers of Edenton North, including the power to assess dues, were set forth in the recorded 2000 restrictive covenants. Filing 60 at 3.

Anthony also complains that there is nothing in the restrictive covenants referencing the amount of the dues that could be imposed. Case no. 4:12-cv-3126 filing 13 at 16. Anthony does not explain why this fact is significant. The covenants establish the process by which Edenton North

homeowners may, from year to year, set the amount of dues to be assessed—which makes sense, because the costs of performing such tasks as maintaining the common areas of the subdivision are likely to vary from year to year. *See* filing 60. And, the Court notes, because the dues are self-imposed by each class of Edenton North members, case no. 4:12-cv-3126 filing 10 at 39, the members have every incentive to be reasonable. In any event, Anthony can point to no authority suggesting that a specific amount of assessable dues be set forth in a restrictive covenant.

Finally, Anthony argues that Edenton North's claim rests on legislation that was not enacted until after Anthony purchased her lot. Case no. 4:12-cv-3126 filing 13 at 16, citing L.B. 155, 2004 Neb. Laws 10. But Anthony is wrong. The statute at issue, Neb. Rev. Stat. § 76-238, was enacted in 1866. It was *amended* in 2004, but the amendments do not affect the issues in this case. When Anthony purchased the lot, § 76-238(1) provided, as it still does, that deeds, mortgages, and other instruments of writing which are required to be or may be recorded, shall take effect and be in force from the time of recording as to creditors and subsequent purchasers in good faith without notice. A homeowners' association's declaration of restrictive covenants is such an instrument, and statutory notice is sufficient. *See, e.g., Hoff v. Ajlouny*, 703 N.W.2d 645, 651 (Neb. App. 2005); *see also Farmington Woods Homeowners Ass'n, Inc. v. Wolf*, 817 N.W.2d 758, 766 (Neb. 2012).

### 6. Whether Covenants Run with the Land

Anthony argues that the bankruptcy court erred in finding that Anthony had notice of the restrictive covenants and covenants to pay dues run with the land. Case no. 4:12-cv-3126 filing 13 at 4, 18-19. But as explained above, Anthony was on statutory notice of the covenants pursuant to § 76-238. *See also, generally, Wolf*, 284 Neb. at 288; *Ihde v. Kempkes*, 422 N.W.2d 788, 435-36 (Neb. 1988); *Hoff*, 703 N.W.2d at 651. That law was in effect, and the deed for Anthony's property advised her that she was taking the property "subject to easements, reservations, covenants and restrictions of record." Filing 59. Simply put, Anthony was on notice. To conclude otherwise would be to reward landowners for willful ignorance.

Anthony's issue statement also questions whether restrictive covenants run with the land, case no. 4:12-cv-3126 filing 13 at 4, but her brief contains no argument that would appear to support that issue, meaning that it has been waived. *See United States v. Aldridge*, 561 F.3d 759, 765 (8th Cir. 2009). And in any event, it is well established that covenants of this kind run with the land. *Regency Homes Ass'n*, 498 N.W.2d at 788-93.

### 7.  Assessment and Notice of Dues

Anthony's seventh stated issue is "[w]hether the Bankruptcy Court erred in determining that dues assessments were made by [Edenton North] and that Anthony was noticed [sic] by [Edenton North] of such assessments." Case no. 4:12-cv-3126 filing 13 at 4. There is no argument in Anthony's brief clearly supporting this issue, so it too has been waived. _Aldridge_, 561 F.3d at 765. And as noted above, there is no evidence that Anthony was not notified of the assessed dues in the ordinary course of Edenton North's business. Edenton North's treasurer testified that after dues were assessed, she prepared and mailed statements to all the members of Edenton North. Case no. 4:12-cv-3126 filing 10 at 63, 70-71. There is nothing in the record to support a finding that Anthony somehow went 4 years without knowing that there were dues to be paid. Nor is there anything to support finding that the debt is invalid, even if Anthony had not received such statements.

### 8.  Dues Assessments in Compliance with Declaration

Anthony's next argument is that Edenton North's dues assessment is not in compliance with the declaration of restrictive covenants, and therefore is unlawful. Case no. 4:12-cv-3126 filing 13 at 4,16. Anthony's argument is that the 2000 declaration provided that dues assessments were to "be uniform as to each lot or living unit" within Edenton North. Filing 60 at 3. And, Anthony contends, they are not, because different classes of member pay different dues based upon their abutment of the common area and entryway. Case no. 4:12-cv-3126 filing 10 at 52-57.

But the restrictive covenants that are actually in effect were amended and recorded in 2004, and they expressly provide for different dues to be assessed on different classes of member. Claim 3-1 at 4. Anthony is essentially arguing that the restrictive covenants violate themselves. But the covenants were amended to permit precisely the sort of dues-assessment scheme about which Anthony is complaining, and Anthony presents no basis for concluding that the amendment was ineffective. Anthony's challenge to the uniformity of the dues assessments has no merit.

Anthony also argues, at this juncture, that her right to due process and "assumption of 'innocence'" were violated because the bankruptcy court presumed the validity of Edenton North's claim. Case no. 4:12-cv-3126 filing 13 at 17-18. Anthony questions how the burden of proof is on her to disprove a creditor's claim. But it is clear, as noted previously, that a proof of claim, properly executed and filed, is prima facie evidence of the validity and amount of the claim, creating a presumption that the claim is valid. Fed. R. Bankr. P. 3001(f); _see also_, _In re Reuter_, 686 F.3d at 515-16; _In re Be-Mac Transp. Co., Inc._, 83 F.3d at 1025. It bears repeating, at this point, that

Anthony initiated her bankruptcy proceeding, not Edenton North, and it is Anthony seeking relief from the court—so it is proper for her to carry some burden of proof.

### 9.  Federal Disclosure Laws

Anthony's ninth stated issue is whether the bankruptcy court ignored federal disclosure laws requiring actual notice of material facts affecting ownership and cost of real property. But Anthony's brief identifies no law imposing such requirements with respect to homeowners' association dues, nor is the Court aware of any. In fact, Anthony's brief contains no argument at all on this issue, so it has been waived. *Aldridge*, 561 F.3d at 765.

### 10.  Alleged Bias of Bankruptcy Court

Finally, Anthony again argues that the bankruptcy court was biased against her. Most of those arguments were dealt with above, and will not be addressed again here. The only unique argument is an assertion, based on Missouri law, that a lien on real property may not be declared as security for a simple money claim for services. But as noted above, Nebraska law controls the substantive aspect of these claims. *See Raleigh*, 530 U.S. at 20-21. And in Nebraska, it is well established that at the very least, homeowners' association dues can give rise to a lien on the land. *See,* § 52-2001(1); *Regency Homes Ass'n*, 498 N.W.2d at 793; *West Town Homeowners Ass'n., Inc.*, 435 N.W.2d at 649. Anthony's final argument lacks merit.

### V. CONCLUSION

It is apparent from the record that Anthony has made some regrettable financial and legal decisions. But Anthony blames others for her misfortune: particularly Cattle National, Edenton North, and now the bankruptcy court. The record, however, demonstrates that Cattle National went well above and beyond the requirements of the law in working with Anthony and trying to avoid foreclosure. Edenton North permitted Anthony to ignore years of homeowners' association dues without enforcing its legal rights against Anthony's property. And the bankruptcy court was more than tolerant of Anthony's efforts to represent herself, even after it became clear that her arguments were spurious at best. Anthony can blame who she likes—but she cannot avoid legal responsibility for the consequences of her decisions.

The Court finds Anthony's arguments to the contrary to be meritless. So meritless, in fact, that the Court has given some thought to whether sanctions might be warranted. See Fed. R. Bankr. P. 8020. The Court has chosen not to do so, in no small measure because it is hesitant to initiate the process of trying to collect such sanctions from Anthony. And while the Court

finds absolutely no merit to Anthony's legal theories, the Court is willing to accept *at this time* that Anthony has advanced them in good faith. But Anthony is cautioned that at some point, continuing to advance meritless legal arguments—particularly arguments that have been repeatedly rejected by every court to hear them—will undoubtedly test the patience and credulity of federal and state courts. This is not to pre-judge the merits of any arguments Anthony may make. It is simply to inform Anthony that, should she persist in raising baseless claims and defenses, it will only be fair that the costs of that litigation fall on her.

The bankruptcy court's orders will be affirmed, and a separate judgment will be entered.[14]

IT IS ORDERED:

1.  The orders of the bankruptcy court (No. BK11-42232 filings 201, 203, and 205) are affirmed.

2.  A separate judgment will be entered.

Dated this 11th day of September, 2012.

BY THE COURT:

John M. Gerrard
United States District Judge

---

[14] *See,* Fed. R. Civ. P. 59; *Hunt v. Guiliano & Father Const.*, 160 Fed. Appx. 670, 672-73 (10th Cir. 2005); *In re Montgomery Ward Holding Corp.*, 217 F.R.D. 326, 327-28 (D. Del. 2003).